# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JACQUELINE ARNOLD,

                  **Plaintiff,**

      v.

LITTON LOAN SERVICING LP,
ELIZABETH HOPKINS, ELLIE
MORIN, and HOLLY SAWYER,

                **Defendants.**

1:08-cv-2623-WSD

## OPINION AND ORDER

This matter is before the Court on Plaintiff Jacqueline Arnold's ("Plaintiff" or "Arnold") Motion for Partial Summary Judgment on the Issues of Liability [42] and on Defendants Litton Loan Servicing LP ("Litton"), Elizabeth Hopkins ("Hopkins"), Eleanor Morin ("Morin"), and Holly Sawyer's ("Sawyer"), (collectively, "Defendants"), Motion for Summary Judgment [45].

## I.     BACKGROUND

Arnold brings against Litton, her former employer, a claim for violation of her rights under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, et seq. ("the ADA") and against Litton and the individual defendants, a claim for

interference with her rights under the Family and Medical Leave Act of 1993, 29

U.S.C. §§ 26 et seq. ("FMLA").

On March 31, 2007, Arnold was serving as Litton's Assistant Vice President

of customer service. Defendants' Statement of Material Facts ("DSMF") ¶¶ 7, 11.

She managed two departments, a call center and the Customer Assistance

Response Team. Id. at 6, 7. Arnold had been in this or a similar position at Litton

since January of 2006. Id. Morin was Arnold's immediate supervisor. Plaintiff's

Statement of Material Facts ("PSMF") ¶ 4. Sawyer was the human resources

generalist for Litton's Atlanta, Georgia office. Id. at ¶ 5. Hopkins was the Senior

Vice President of Litton's Human Resource Department. Id. at ¶ 6.

Arnold alleges that on March 31, 2007, she was suffering from and

displayed symptoms of late onset bi-polar disorder with delusions.

Arnold reported to several Litton managers on March 31, 2007, that she had

received an inappropriate email on her blackberry. DSMF ¶ 11. Chris Belk, a

technology support manager at Litton, spoke with Arnold about the email she

reported to have received and, based on the conversation, considered it possible

that there was a hostage situation in the office. Id. at ¶¶ 13, 14. Belk and another

Litton manager contacted the police. Id. at ¶ 14. After it was determined that no

one at Litton's office was being held hostage, Arnold clarified that the email she

allegedly received was a sexually-explicit one.  Arnold told Sawyer that she believed her ex-husband had hacked into the Litton computer system and sent the email.  Id. at ¶ 20.  Litton searched its backup data for the email described by Arnold, but could not find a sexually-explicit or otherwise inappropriate message sent to her.  Id. at ¶ 25.

On Monday, April 2, Arnold requested time off to meet with her attorney, to go to the police to obtain a restraining order against her ex-husband, and to meet with her physician.  Id. at ¶ 28.  Litton granted her request.  Id. at ¶ 29.  Later that same day, Arnold came to the Litton office and gave Tomika Thomas, the Litton facilities manager, a "Spiritual Healing" book and an astrologer's brochure, which she asked Thomas to mail to two Litton executives.  Id. at ¶¶ 30, 31, 32.

On the afternoon of April 3, Arnold told Sawyer that she had seen a psychiatrist earlier that day, but intended also to see a counselor.  Id. at ¶ 33.  Arnold claimed that she had been released to return to work, but wanted to see a counselor before she did so.  Litton placed Arnold on a ten-day paid leave of absence, to allow Arnold time to deal with issues with her ex-husband.

On Monday, April 9, Arnold came to Litton during working hours with her mother and daughter.  Id. at ¶ 43.  Arnold and her mother began showing family photo albums to Arnold's subordinates and co-workers.  Id. at ¶ 44.  Arnold

alleges that during this office visit, Morin asked Arnold's mother if Arnold was taking her "bipolar medication." Defendant disputes that this conversation occurred. Sawyer told Arnold she was not to return to the office until she was released by her physician to do so. Id. at ¶ 49.

On April 18, Arnold was admitted to Anchor Hospital, where she remained until April 22. PSMF ¶ 34. While in the hospital, Arnold was diagnosed by a psychiatrist as suffering from bipolar disorder. Id. at ¶ 35.

On April 23, Arnold left a voice message for Sawyer to advise her that Arnold was on the way to a doctor's appointment and that she had information about her FMLA paperwork. DSMF ¶ 51. Later that day, Arnold again returned to Litton, where Sawyer found Arnold in the call center hugging her subordinates. Id. at ¶¶ 54, 55. Sawyer escorted Arnold to the lobby and again instructed her not to come back to the office until she was released by her physician to return to work. Id. at ¶ 56. On April 24, Arnold contacted Sawyer again by telephone, regarding her FMLA certification, and later that day Arnold returned to Litton, despite the fact that she had not been released by her physician to return to work and in violation of the instructions she had received from Sawyer. Id. at ¶¶ 59, 63. On May 1, Litton received Arnold's FMLA certification, which indicated that Arnold needed to be away from work for another four to six weeks. Id. at ¶ 73.

Between April 24 and May 17, 2007, Arnold returned to Litton several more times and engaged in behavior that Litton contends was disruptive and inappropriate. On May 3, 2007, Arnold called several employees during working hours to remind them that it was National Prayer Day. Id. at ¶ 79. On May 7, 2007, Arnold drove to Litton's parking lot, and parked in a visitor's space in front of the building, where she sat in her car. On the evening of May 7 and the morning of May 8, 2007, Arnold called numerous employees asking for the offsite location of the annual May 8 Employee Appreciation Breakfast. Id. at ¶ 88. After learning where the breakfast was held, Arnold tried to attend. Id. at ¶ 91. She was on her way to the ballroom where the breakfast was underway, when Sawyer and Morin saw her, and escorted her back to her car. Id. at ¶ 92.

On May 8, 2007, Litton sent Arnold a written warning letter reiterating and enlarging the verbal instructions that Litton had given Arnold, specifically instructing that until she was cleared to return to work, Arnold was prohibited from: (1) being on company premises, including parking lots; (2) attending company meetings, whether on company premises or offsite; and (3) contacting Litton employees (other than Sawyer or Morin) during business hours. The letter also explained that "any further violations may result in disciplinary action up to and including termination of employment." Id. at ¶¶ 95, 96, 97.

On Tuesday, May 15, Arnold told Sawyer that her doctor intended to release Arnold to return to work on the following Monday, for four (4) hours per day. Id. at ¶ 99. Sawyer contacted Arnold's doctor, allegedly with Arnold's permission, and asked about any restrictions to which Arnold would be subject to when she returned to work. In that conversation, Sawyer explained to the physician Arnold's job duties and described Arnold's past conduct. Id. at ¶¶ 101, 102. Arnold's doctor told Sawyer that he would set up an appointment with Arnold, run some blood tests, and reevaluate Arnold's release, and timing of release, to return to work. Sawyer also spoke with Arnold's therapist. Litton did not receive Arnold's release to return to work. Id. at ¶ 105.

Litton contends that on May 15, Arnold spoke with Sawyer about her possible return to work. Arnold then contacted Thomas, Defendant's facilities manager. Two days later, on May 17, Arnold called Rinda Turnipseed, a co-worker, during working hours. Id. at ¶ 111.

Arnold contends that on May 15, she called Morin, as she was instructed, and received a recorded message to call Morin's assistant if Morin was unavailable. Arnold claims she left a voice mail message on Morin's assistant's phone, stating that she anticipated a release from her doctor to return to work on May 22, 2007. Arnold further states that on May 17, 2007, she acknowledges she

had a brief phone conversation with Turnipseed, whom Arnold claims was a friend.

On May 22, 2007, Sawyer received a fax from Arnold's physician releasing Arnold to return to work for four (4) hours per day, effective May 29, 2007. Id. at ¶ 119. According to Sawyer, Arnold's call to Turnipseed was the last straw and was a violation of company policy because it was "potentially a disruption to business."[1] Arnold was notified of her termination on May 23, 2007, which was made effective on May 29, 2007, the date Arnold was medically released to return to work. Arnold never returned to work at Litton.

Litton contends that because of "blatant violations and Litton's resulting loss of confidence in Arnold, Litton decided on or about May 18 to terminate Arnold." Def.'s Br. 12. In its May 23, 2007, termination letter, Litton cited Arnold's failure to "discontinue contacting [Litton] employees during business hours and disrupting Litton business for the duration of [her] leave of absence," as a basis for her termination. Id. at ¶¶ 120, 121. The letter also stated that the violations "coupled with [Arnold's] erratic behavior and the judgment errors [Arnold had] displayed

---

[1] According to Morin the two calls to Morin's assistant and to Turnipseed on May 15 and 17, respectively, were significant because they showed that Arnold was "not capable of following simple instructions."

ha[d] caused the Company to lose faith in [Arnold's] ability to perform [the] essential functions of managing employees and speaking with customers." Id.

Arnold contends that the decision to terminate her was a collective decision made by Hopkins, Morin, and Sawyer. Arnold represents that the first draft of the termination letter was prepared by Sawyer and stated that Arnold was being terminated for her "abysmal judgment" since March 31, 2007. Arnold contends that Paul Spiker, Sawyer's supervisor, also became involved in drafting the termination letter and suggested that the reason Arnold needed to be terminated was a concern about what might potentially happen in the future.

Arnold moves for summary judgment on her FMLA and ADA claims, arguing that Litton interfered with her right to return to work at the conclusion of her FMLA leave and that, but for her bi-polar disorder she would not have been terminated. Litton also moves for summary judgment on these two claims, arguing that the undisputed evidence demonstrates legitimate reasons for Arnold's termination.[2]

---

[2] One of Litton's arguments is that Arnold did not timely file her response to Litton's motion for summary judgment, and as such, it should not be considered. The Court will not consider this argument. See Foman v. Davis, 371 U.S. 178, 181-182 (1962) (quoting Conley v. Gibson, 355 U.S. 41, 48 (1957) and citing Fed. R. Civ. P. 1) ("It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities. 'The Federal Rules reject the approach that

## II.    DISCUSSION

### A.    Standard on Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Where the record tells two

---

pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.'  The Rules themselves provide that they are to be construed 'to secure the just, speedy, and inexpensive determination of every action.'").

different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment. Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (internal quotations omitted).

"[The Eleventh] Circuit has long stated that the granting of summary judgment . . . is 'especially questionable,'" because such cases "'usually involve [the] examin[ation] [of] motive and intent.'" Batey v. Stone, 24 F.3d 1330, 1336 (11th Cir. 1994) (quoting Hayden v. First Nat'l Bank, 595 F.2d 994, 997 (5th

Cir.1979)).  A defendant in an employment discrimination case is nevertheless

entitled to summary judgment if the plaintiff has failed to establish a prima facie

case.  See Pace v. Southern Railway System, 701 F.2d 1383, 1391 (11th Cir.

1983).

     B.    FMLA

The FMLA guarantees eligible employees the right to twelve (12) weeks of

leave during any twelve-month period because of a serious health condition that

makes the employee unable to perform the functions of the employee's position.

29 U.S.C. § 2612(a)(1).  The Act also provides that an eligible employee who

returns to work prior to the expiration of her FMLA leave must be restored to the

same position the employee held at the time the employee's leave began, or to an

equivalent position.  29 U.S.C. § 2614(a)(1).  "To preserve the availability of these

rights, and to enforce them, the FMLA creates two types of claims: interference

claims, in which an employee asserts that his employer denied or otherwise

interfered with his substantive rights under the Act, and retaliation claims, in which

an employee asserts that his employer discriminated against him because he

engaged in activity protected by the Act."  Strickland v. Water Works, 239 F.3d

1199, 1206 (11th Cir. 2001).  Plaintiff here asserts an interference claim.

It is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." 29 U.S.C. §2615(a)(1). "To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." Strickland, 239 F.3d at 1206.

The FMLA provides, however, that "[n]othing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment." 29 C.F.R. § 825.216(a). "[W]hen an 'eligible employee' who was on FMLA leave alleges her employer denied her FMLA right to reinstatement, the employer has an opportunity to demonstrate it would have discharged the employee even had she not been on FMLA leave." O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1354 (11th Cir. 2000).

C.	Analysis of Plaintiff's FMLA Claim

The parties do not dispute that Arnold was entitled to and took FMLA leave.

Arnold alleges Defendant violated the FMLA by failing to restore her to her

previous Assistant Vice President position or its equivalent.  Arnold argues that her

late onset bipolar condition required her to take FMLA leave and that Litton's

stated reasons for terminating her were in fact because of that condition.[3]  Arnold

contends that prior to March 31, 2007, when she claims she began to exhibit

symptoms of bipolar disorder, she was a valued employee with an outstanding

record, but that after she began showing her symptoms, she was not allowed to

return to work.  Although Litton claims it terminated for her for her errors in

judgment and erratic behavior, Arnold argues that there is no way to disassociate

such reasons from the reasons why Arnold was on FMLA leave in the first place.

Arnold thus contends, "[g]iven the complete absence of any reason to terminate

Arnold before March 31, 2007, the nature of her serious illness, and the fact that

she was never allowed to return to work after the initial onset of her disease, it is

hard to imagine that any reasonable person could create a genuine issue of fact

---

[3] Arnold asserts that the manic and hyper behavior she exhibited, and upon which
the decision to terminate her was based, is typical of someone with bipolar disease
who is unmedicated.

about the connection between Arnold's FMLA leave and her subsequent termination."  Pl.'s Br. at 14.

Litton argues that its reasons for terminating Arnold were unrelated to Arnold's FMLA leave and that she was terminated based on her repeated violations of Litton's directives to remain away from Litton and not to contact employees, other than Morin and Sawyer, during her leave.  Litton contends that it tried on multiple occasions to require Arnold to comply with its directives, but that Arnold ignored its warnings, disrupting Litton's business when she appeared at Litton's premises and contacted Litton's employees, causing Litton to lose confidence in her.  Litton argues that Arnold's failure to abide by Litton's instructions to her led to her termination, and that her termination occurred while she was on FMLA leave is not relevant.

Under the FMLA, an employee's restoration right is not absolute. O'Connor, 200 F.3d at 1354.  When an employee's right to reinstatement after taking FMLA leave is denied, the employer will not be liable if it terminated the employee for reasons unrelated to the FMLA leave.  See id.; Parris v. Miami Herald Pub. Co., 216 F.3d 1298, 1301 n.1 (11th Cir. 2000).  "The FMLA simply does not force an employer to retain an employee on FMLA leave when the employer would not have retained the employee had the employee not been on

FMLA leave." Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 977 (8th Cir. 2006). That is, the defendant must show that the employee's right to take FMLA leave was not considered at all in the defendant's decision to terminate the employee. Strickland, 239 F.3d at 1208. If FMLA was in any way considered in reaching a termination decision, this constitutes interference with the employee's FMLA rights. Litton bears the burden of demonstrating that its reasons for terminating Arnold were wholly unrelated to her FMLA leave. Strickland, 239 F.3d at 1208; Throneberry, 403 F.3d at 979.

Plaintiff and Litton argue the facts are undisputed here and they each argue they are entitled to summary judgment on Plaintiff's FMLA claim. Plaintiff claims she was discharged for conduct which was the by-product of, and hence directly related to, or at least interwoven with, the ailment for which she was on FMLA leave, and thus her discharge unlawfully interfered with her FMLA rights. Arnold argues that her conduct and judgment were affected by her bipolar disorder, the condition for which she was on FMLA leave, and therefore those factors are not an independent and legitimate basis for her termination. Arnold argues, in essence, that had she not been on FMLA leave, Litton would not have put in place the various restrictions about when she could be present at the office and whom she could contact.

Litton relies on <u>McBride v. Citgo Petroleum Corp.</u>, to respond to Plaintiff's argument. <u>McBride</u>, while not binding in this Circuit, provides reasoning and analysis that is helpful in evaluating the facts here. <u>McBride</u> holds that the FMLA does not protect an employee from the consequences of her own misconduct, even if the misconduct is caused by the condition for which the FMLA leave is taken. 281 F.3d 1099, 1108 (10th Cir. 2002). The court in McBride observed, "[w]hile it may be true that [a plaintiff's work performance] problems [may] result of her illness, the FMLA does not protect an employee from performance problems caused by the condition for which FMLA leave is taken . . . . The FMLA only protects an employee's right to request and take leave while ill."

<u>McBride</u> does not apply, Arnold argues, because that case involved the termination of an employee for performance issues that happened before her FMLA leave but which were not discovered until during her leave. Arnold argues the conduct for which she was terminated occurred after her leave was taken. Arnold also argues that she had no previous performance issues, and, more importantly "none of the conduct cited by Defendant as disruptive to the workplace would have been so termed but for the fact that Arnold was on leave." Pl.'s Reply Br. 10-11. Arnold argues further that most of her office visits and contacts cited by

the Defendants were directly related to her attempts to provide the requested FMLA paperwork and to return to work.

Litton argues it instructed Arnold not to come into the office and not to contact certain employees. Arnold, Litton claims, violated directives Litton put into place to avoid what it believed to constitute disruption in its workforce.[4] Litton argues that "[i]f any employee violated a directive that Litton had repeatedly and clearly communicated, that employee would be subject to termination. This is true whether the insubordination occurred before, during, or after a period of FMLA leave; the same would also be true if no leave was ever taken." Def.'s Reply Br. 2-3. Violations of Litton's directives, even if a result of Arnold's alleged disorder or because she decided to provide FMLA paperwork, conceivably still could constitute a lawful ground for her discharge. The Court cannot conclude on the facts before the Court, that Litton's grounds for terminating Arnold were

---

[4] There seems even to be questions regarding what restrictions were in place at what time and whether Arnold's conduct violated restrictions that were in place when Arnold engaged in certain conduct. Initially, Arnold was restricted from Litton's premises. This later was expanded to Litton off-premises events and then to off-premises contact with Litton employees. This muddled record underscores the difficulty of resolving the dispute on competing motions for summary judgment.

wholly unrelated to her disability or her FMLA leave.[5]  The motivation and reasons

for the discharge simply are disputed issues that are required to be resolved at

trial.[6]  The Court necessarily concludes that Plaintiff's and Defendants' motions for

summary judgment on the FMLA claim are required to be denied.

    D.    <u>ADA</u>

The ADA protects a "qualified individual with a disability" from

discrimination in the "terms, conditions, and privileges of employment."  42

U.S.C. § 12112(a) (2000).  A plaintiff may show discrimination through direct or

circumstantial evidence.

The Eleventh Circuit defines direct evidence as "evidence, that, if believed,

proves [the] existence of [a] fact without inference or presumption."  <u>Morris v.</u>

<u>Emory Clinic, Inc.</u>, 402 F.3d 1076, 1081 (11th Cir. 2005); <u>Wilson v. B/E</u>

<u>Aerospace, Inc.</u>, 367 F.3d 1079, 1086 (11th Cir. 2004) (quoting <u>Burrell v. Bd. of</u>

<u>Trustees of Ga. Military Coll.</u>, 125 F.3d 1390, 1393 (11th Cir. 1997)).  Direct

evidence consists of "only the most blatant remarks, whose intent could be nothing

---

[5] The discussion in the section of this Opinion addressing Plaintiff's ADA claim
provides further factual content showing the uncertainty of what really was the
reason for Defendants' decisions here.

[6] The Court notes that if the trier of fact concludes that Arnold was discharged for
failure to follow Litton's directions not to visit or to make unauthorized contact
with Litton employees, Arnold may fail on both her FMLA and ADA claims.

other than to discriminate." Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989).

Absent direct evidence, a plaintiff demonstrates discrimination using the burden-shifting framework the Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000). A plaintiff must first establish a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability." Mervyns, 207 F.3d at 1365.

A disability is defined as: (A) a physical or mental impairment that substantially limits one or more major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. §12102(2) (2000).[7]

---

[7] On September 25, 2008, Congress enacted the ADA Amendments Act of 2008 (ADAAA) in order to "reinstat[e] a broad scope of protection" under the ADA and to "reject" the holdings in Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184 (2002), and Sutton v. United Air Lines, 527 U.S. 471 (1999). ADAAA § 2(b), Pub. L. No. 110-325, 122 Stat. 3553, 3554. Among other things, the ADAAA requires that, with the exception of eyeglasses or contact lenses, the "determination of whether an impairment limits a major life activity shall be made without regard

Major life activities are defined to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Under the ADA, work is a major life activity. Carruthers v. BSA Advertising., Inc., 357 F.3d 1213, 1216 & n. 2 (11th Cir. 2004). For the major life activity of work to suffer substantial limitation, the ADA "requires, at a minimum, that plaintiffs allege that they are unable to work in a broad class of jobs." Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999). "[A]n individual's ability to work is 'substantially limited' when the individual is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person

---

to the ameliorative effects of mitigating measures such as . . . medication." 122 Stat. at 3555, codified at 42 U.S.C. § 12102(4)(E)(i)(I). As discussed below, the ADAAA's requirement that an impairment be determined without reference to the ameliorative impact of medication may have affected the analysis of this action.

The ADAAA became effective on January 1, 2009. Although the Eleventh Circuit has not addressed the issue, the Fifth, Sixth, Seventh, Ninth and District of Columbia Circuits have all concluded that the ADAAA does not apply retroactively. See Becerril v. Pima County Assessor's Office, 2009 WL 4067450, * 2 (9th Cir. November 25, 2009); Lytes v. DC Water & Sewer Auth., 572 F.3d 936, 941 (D.C. Cir. 2009); Fredricksen v. United Parcel Serv. Co., 581 F.3d 516, 521 n. 1 (7th Cir. 2009); Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 565-67 (6th Cir.2009); EEOC v. Agro Distrib., LLC, 555 F.3d 462, 469 n. 8 (5th Cir. 2009). Courts do not apply statutes retroactively "absent clear congressional intent favoring such a result." Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994). Because the ADAAA explicitly provides that the amendments would become effective on January 1, 2009, and because Plaintiff's ADA claim stems from her termination in 2007, the Court applies the pre-Amendments ADA and its interpretive case law.

having comparable training, skills, and abilities." <u>D'Angelo v. ConAgra Foods, Inc.</u>, 422 F .3d 1220, 1227 (11th Cir.2005) (citation omitted). <u>See also</u> 29 C.F.R. § 1630.2(j)(3)(i). A person "whose mental or physical impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." <u>Greenberg v. BellSouth Telecomms., Inc.</u>, 498 F .3d 1258, 1264 (11th Cir.2007) (citation and quotation omitted).

A "qualified individual" is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8); <u>Holly v. Clairson Indus.</u>, 492 F.3d 1247, 1256 (11th Cir. 2007). "[E]ssential functions are the fundamental job duties of a position that an individual with a disability is actually required to perform . . . Moreover, consideration shall be given to the employer's judgment as to what functions of a job are essential . . . ." <u>Id.</u> at 1257 (internal citations and quotations omitted). Plaintiff bears the burden of identifying a reasonable accommodation that would allow her to perform a job's essential functions. <u>See</u> <u>Mervyns</u>, 207 F.3d at 1367 (11th Cir. 2000). An employer is not required to eliminate an essential function to accommodate a disabled worker. <u>Davis v. Florida Power & Light Co.</u>, 205 F.3d 1301, 1305 (11th Cir. 2000).

The ADA only prohibits discrimination against qualified individuals, "no more and no less." Fussell v. Georgia Ports Authority, 906 F. Supp. 1561, 1571 (S.D. Ga. 1995), aff'd 106 F.3d 417 (11th Cir. 1997); Dockery v. North Shore Medical Center, 909 F. Supp. 1550, 1561 (S.D. Fla. 1995) ("The ADA does not require that employers provide greater benefits to disabled employees than it grants to its other employees. As a result, [plaintiff] cannot claim that, as a disabled employee, she is entitled to greater leave rights than other employees.").

E.     Analysis of Plaintiff's ADA claim

1.     *Direct evidence of discrimination*

Arnold moves for summary judgment, arguing that direct evidence demonstrates Litton discriminated against her on the basis of her disability in violation of the ADA. Arnold claims that although her bipolar disorder, when treated with medication, does not substantially limit a major life activity, Litton regarded her as disabled and terminated her accordingly. Pl.'s Mem. 15.

A person is regarded as disabled if she: (1) has an impairment that does not substantially limit a major life activity, but is treated by the employer as though it does; (2) has an impairment that limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is

treated by the employer as having a disability as recognized by the ADA.  <u>Hilburn v. Murata Elecs. N. Am.</u>,181 F.3d 1220, 1230 (11th Cir. 1999).

Bipolar disorder has been held to constitute an impairment under the ADA. <u>Price v. Facility Management Group, Inc.</u>,403 F. Supp. 2d 1246, 1254 (N.D. Ga. 2005) (citing <u>Pritchard v. Southern Co. Servs.</u>, 92 F.3d 1130, 1132 (11th Cir. 1996).  However, merely having an impairment does not render a person disabled. <u>Id.</u> at 1254.  Arnold must show that her employer regarded her bipolar disorder as a condition that substantially limited one or more of her major life activities.  <u>Id.</u>[8]

Arnold contends she was terminated because her employer "chose to remain ignorant about her condition and concluded instead that she was no longer capable of performing her job and was unlikely to ever be competent again."  Pl.'s Mem. 15.  To meet her evidentiary burden, Arnold points to an email from Paul Spiker, Sawyer's supervisor, the draft of her termination letter, and the termination letter that was actually sent to Arnold.  She contends each demonstrates that Arnold was terminated due to a prejudicial fear about the potential impact of her bipolar disorder on Litton's business.

---

[8] As noted above, the ADA regulations define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).

Spiker's email to Hopkins, commenting on the draft of Arnold's termination letter states:

> I did and I agree with your initial comments about needing to tie in some of the more severer [sic] incidents and her judgment and how that could potentially affect our business needs (dealing with borrowers, interacting with employees, etc.) and what our concerns are. Otherwise, I think it just has a bad smell to it if she tries to make it out that we are getting rid of her for some other reason(s) instead of just calling a few people as the letter states.

See Pl.'s Ex. 22.

Defendant responds that Spiker was not involved in the actual decision to terminate Arnold and that only after that decision was made did Spiker comment on the draft termination letter. Arnold does not allege that Spiker was involved in the decision to terminate Arnold. PSMF ¶ 96. Because Spiker was not a decision-maker in terminating Arnold, Litton contends, his comments are not direct evidence of discriminatory intent. Bass v. Bd. of County Commissioners, Orange County Fla., 256 F.3d 1095, 1105 (11th Cir. 2001) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision."). Litton also argues that its reasons for terminating Arnold remained the same, before and after Spiker offered his input, and that Arnold was terminated because of her repeated disregard for Litton's instructions, disruption to Litton's business, and Litton's loss of trust and

confidence in Arnold's judgment.  Finally, Defendant notes that neither the draft or final termination letters, or Spiker's comments refer to Arnold's condition but instead focused on her conduct.

The Court concludes that Arnold has failed to present sufficient evidence of direct discriminatory intent to prevail on summary judgment.  Absent evidence of "the most blatant remarks, whose intent could be nothing other than to discriminate," B/E Aerospace, Inc., 367 F.3d at 1086, Arnold has not met her burden to establish the absence of a genuine dispute as to this material fact, Herzog, 193 F.3d at 1246.  Her motion for summary judgment is required to be denied.

2.    *Circumstantial evidence of discrimination*

Absent direct evidence, the burden-shifting analysis in McDonnell Douglas applies to Plaintiff's ADA claim.  Under McDonnell Douglas, a plaintiff must show the plaintiff is: (1) disabled; (2) qualified individual; and (3) was subjected to unlawful discrimination because of her disability."  Mervyns, 207 F.3d at 1365. Litton moves for summary judgment, arguing that Arnold cannot satisfy any of the three prongs of her prima facie case required to be met under McDonnell Douglas. The Court reviews each of the prongs in turn.

i.  Disability

To be entitled to the protections of the ADA, Arnold must establish she is disabled.  42 U.S.C. § 12112(a) (2000).  Arnold contends that her mental impairment, when properly treated with medication, does not substantially limit a major life activity, but that Litton regarded it as though it did.  Pl.'s Mem. 15.  See Hilburn, 181 F.3d at 1230.  As noted, bipolar disorder has been held to constitute an impairment under the ADA.  Price, 403 F. Supp. 2d at 1254.  However, "[t]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled."  Sutton v. Lader, 185 F.3d 1203, 1209 (11th Cir. 1999).  Arnold must also show that her employer regarded her bipolar disorder as a condition that substantially limited one or more of her major life activities.  Id.

Litton argues that it did not regard Arnold's condition as substantially limiting one or more of her major life activities and further argues that Arnold offers no evidence that Litton regarded her as substantially limited in her ability to walk, talk, see, breathe, or work.  Litton further notes there is no evidence of any perception on Litton's part that Arnold was unable to perform a broad range of jobs.  Even if Litton regarded Arnold as unable to perform her current position, "[t]he inability to perform a single, particular job does not constitute a substantial

limitation in the major life activity of working." <u>Rossbach v. City of Miami</u>, 371

F.3d 1354, 1359 (11th Cir. 2004); <u>Witter v. Delta Air Lines, Inc.</u>, 138 F.3d 1366,

1369-70 (11th Cir. 1998).  To establish that she is substantially limited in her

ability to work, Arnold must show that she is "significantly restricted in the ability

to perform either a class of jobs or a broad range of jobs in various classes."

<u>Rossbach</u>, 371 F.3d at 1359; 29 C.F.R. § 1630.2(j)(3)(i).

Litton argues that the undisputed evidence demonstrates it always expected

Arnold to return to work, and prepared for her return, noting that Litton did not

take any action to find a replacement for Arnold during her leave and it did not

assign other Litton employees to the tasks assigned to Arnold.  Because Arnold's

doctor and therapist explained that, with medication, Arnold would return to

normal, Litton never perceived that Arnold's bipolar condition would substantially

limit her major life activities.

Arnold argues that Litton's claim that it did not regard her as disabled is not

credible.  She submits that Litton first claims that it did not regard Arnold as

disabled because it believed her condition was temporary and that she would return

to normal once she was on medication.  Arnold points out that Litton next claims

that it terminated Arnold, because it had "lost faith" in her ability to perform her

essential job functions of exercising good judgment, managing employees, and

dealing with customers. Arnold contends that these symptoms of her disorder were indeed temporary, but that Litton never allowed her the opportunity to return to work and demonstrate that she fully was capable of performing her job. Arnold argues this indicates Litton regarded her as substantially limited her major life activities, or "disabled" under the ADA.

The issue presented here is a factual one, involving how Litton perceived and reacted to Arnold's diagnosed illness. The Court cannot conclude, on the record before it, that Litton did not regard Arnold as disabled, and therefore cannot conclude, as a matter of law, that Arnold is unable to satisfy this prong of a prima facie case of unlawful discrimination. The Court cannot conclude that a rational trier of fact could not find for Arnold on her ADA claim. Scott, 550 U.S. at 380.

ii. Qualified individual

Litton argues that Arnold "admits" that there was reasonable concern about her ability to perform an essential function of her job, namely, the exercise of sound judgment. Def.'s Br. 20. Arnold contends that once she received treatment and was on medication, however, her judgment and behavior would return to normal. Litton, in arguing that it did not regard Arnold as disabled, seems to concede this point. The Court therefore cannot conclude, on the record before it,

that Arnold is not a qualified individual and would, as a matter of law, be unable to satisfy this prong of a <u>prima facie</u> case of unlawful discrimination.

### iii. <u>Subjected to unlawful discrimination</u>

Arnold alleges she was unlawfully terminated on May 29, 2007, after Litton was aware of her bipolar disorder and her attempt to seek treatment. Arnold alleges she was terminated on the basis of her disability. This is a factual question to be decided by the trier of fact.

### iv. <u>Whether Litton's stated reasons for termination are pretext</u>

Finally, Litton claims it had a legitimate business reason for Arnold's termination and that the termination was based on her failure to abide by Litton's directions regarding visits to Litton's premises and contact with its employees. If a plaintiff makes her <u>prima facie</u> case of discrimination, "the employer has the burden of articulating a legitimate nondiscriminatory reason for the challenged employment decision." <u>Farley v. Nationwide Mut. Ins. Co.</u>, 197 F.3d 1322, 1336 (11th Cir. 1999). The plaintiff must "demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." <u>Id.</u> (citation omitted). To overcome a legitimate, nondiscriminatory reason, a plaintiff must "present significant probative evidence that the articulated reason is merely a pretext for discrimination." <u>Elrod v. Sears,</u>

Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  The pretext inquiry "is concerned with the employer's perception of the employee's performance, not the employee's own beliefs."  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332-33 (11th Cir.1998).  An employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  Nix v. WLCY Radio, 738 F.2d 1181, 1187 (11th Cir. 1984).

Arnold contends that Litton's stated reasons for terminating her are themselves related to her disability.  "For purposes of the ADA, with a few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination."  Humphrey v. Memorial Hospitals Ass'n,  239 F.3d 1128, 1139 -1140 (9th Cir. 2001) (citing Hartog v. Wasatch Academy, 129 F.3d 1076, 1086 (10th Cir. 1997)).  "The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability."  Id.

Litton argues that an employer may terminate an employee for misconduct even when the misconduct is caused by the disability itself.  For this proposition, Litton relies on Biggs v. Florida Bd. of Regents, 1998 WL 1069456, *7 (N.D. Fla.

Oct. 28, 1998).  In <u>Biggs</u>, however, it was undisputed that the employee never requested an accommodation for her bipolar mood disorder prior to being terminated and that the employee engaged in a pattern of threatening her co-workers.  <u>Id.</u> at * 6-7.  Litton also cites <u>Hardy v. Sears, Roebuck & Co.</u>, No. 4:95-CV-0215, 1996 WL 735565, at *6, *9 (N.D. Ga. Aug. 28, 1996), where this Court granted summary judgment to an employer where a plaintiff's bipolar disorder caused him to engage in inappropriate and insubordinate behavior in the workplace resulting in his termination.  In <u>Hardy</u>, however, the employer initially accommodated the employee with a modified work schedule and evidence indicated that the employee subsequently failed to take his prescribed dose of lithium, used to treat his bipolar disorder.  The nature of her conduct certainly does not rise to the level of serious conduct present in <u>Biggs</u>.  Here, unlike in <u>Hardy</u>, Litton did not provide to Arnold the chance to treat her disability with medication, let alone accommodate her work schedule.

Arnold offers some evidence that Litton's reasons for terminating her were pretextual.  Litton admits that after learning Arnold was to be released to return to work, Sawyer contacted Arnold's doctor and therapist to discuss any accommodations Litton would need to provide in light of Arnold's disorder. DSMF ¶ 101, 102, 104.  Sawyer discussed Arnold's job duties and described

Arnold's past conduct.  Id.  Apparently based on this conversation, Arnold's doctor agreed to reevaluate the nature and timing of Arnold's release to return to work. Arnold's therapist testified that he believed Sawyer seemed resistant to the idea of Arnold's returning to work, despite his explanation of the effects of medication on bipolar patients.  Litton effectively terminated Arnold on May 29, 2007, the day she was released to return to work.  The timing of the termination necessarily meant Arnold never had an opportunity to perform her job while on medication prescribed for her bipolar disorder.

Arnold also argues that the reasons initially given for her termination were the two phone calls she made to Litton employees, admittedly in violation of Litton's direction that she refrain from further contact with the company while on leave.  Arnold points to the deposition testimony of Hopkins and Sawyer, in which both admit that that these minor violations alone would not have been sufficient grounds for termination.  Litton responds that it was Arnold's cumulative behavior that led to her termination and that Arnold unduly focuses on the two phone calls that were, according to Litton, simply the last straw.  Arnold's termination letter, however, refers explicitly to these two calls.  Arnold suggests this is evidence that Litton was seeking to concoct a nondiscriminatory basis to terminate Arnold.

Finally, although Litton contends that Spiker was not involved in the decision to terminate Arnold, Arnold argues that Spiker's comments that Arnold's continued employment "could potentially affect our business needs" indicates Litton's unwillingness generally to risk having an employee with bipolar disorder. Litton argues that Spiker's email referred only to Arnold's conduct and, again, argues that such conduct should be considered separately from her mental condition.

The reasons for Arnold's termination and the motivations behind it are fact-intense questions, unsuited for summary judgment. Batey v. Stone, 24 F.3d 1330, 1336 (11th Cir. 1994). Litton claims that Arnold was terminated for the legitimate, nondiscriminatory reason that Arnold was insubordinate and violated basic directives put in place during her leave from the company. Arnold has presented sufficient evidence to challenge these motivation reasons and to create an issue of fact whether Litton unlawfully terminated her because of her disorder. A jury could reasonably find the requisite causal link between a bipolar disability and Litton's termination decision and find the decision constituted disability discrimination. A jury could reasonably find that Litton's stated reasons for terminating Arnold were pretextual.

In light of the evidence Arnold presents supporting her _prima facie_ case, and the material factual dispute regarding whether Litton's stated reasons for Arnold's termination are pretextual, the Court concludes that Litton's motion for summary judgment on Arnold's ADA claim is required to be denied.

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff Jacqueline Arnold's Motion for Partial Summary Judgment on the Issues of Liability [42] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Litton Loan Servicing LP, Elizabeth Hopkins, Eleanor Morin, and Holly Sawyer's Motion for Summary Judgment [45] is **DENIED**.

**SO ORDERED** this 23rd day of December, 2009.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE